Court. My name is Glenn Cantor and I represent the appellant Robert Shupe. Your Honors, I'm here today because of what can only be characterized as a gross miscarriage of justice. In 2004, Mr. Shupe, after having failed surgery to treat his horribly painful spinal disease of osteomyelitis, and after a failed attempt to return to his occupation as a chef, was forced to go out on disability. He was paid benefits for 11 years. In 2016, after receiving benefits for 11 years, despite a deterioration in his condition, Hartford improperly terminated his benefits. If the record in this case is examined fully and fairly, it is literally impossible to find the termination of benefits was based on a preponderance of the evidence in the record. Mr. Cantor, with regard, is there any other evidence against your client other than the Wolf FCE in all the 11 years? No, Your Honor. In fact, I was prepared to go through the litany of the evidence where Hartford found again and again and again that he would not be returning to work. During that 11-year period. Counsel, you do have Dr. Lewis's report, so you've got Wolf and Lewis, and those are the only contrary evidence to the other medical evidence on Mr. Shupe. Yes, but Dr. Lewis came after the denial, so I thought Judge in order to take it all in context, I think you have to look at what occurred during the 11 years before the termination. Starting in 2004, Mr. Shupe underwent no less than 25 interventional procedures in an attempt to alleviate his pain, including a surgery to decompress his spine, two separate spinal fusions, the implantation of a spinal stimulator, and countless injections to relieve his client authorizations, and his doctors deemed there was nothing more they could do in the way of interventional procedures. So, what counsel, what's our standard of review here? It's de novo, Your Honor. The district court looked at this de novo, but it did it on summary judgment, and my understanding of the Fourth Circuit law is you will review summary judgments de novo. So, do we owe any deference to the district court, or for that matter, to the Hartford's administrative review? I believe absolutely not. The district court's opinion, I think, is, to be honest, irrelevant to this matter. This court is looking at the facts de novo on its own, and with regard to Hartford, my take is that given the facts, it should be given less than, not only no deference, but it should have deference taken away because its credibility findings are so, so lacking. Any other questions on the review standard? No, but I have a question about when he does, when he takes a break from sitting, what does he need to do to relieve the pain, and how long does that take? Well, I think that assumes facts that there's no evidence that it will leave the pain. If you're speaking of the Dr. Wolf FCE that Hartford ordered prior to his termination, Dr. Wolf said he can sit for six hours a day, but what he said was the client, speaking of Mr. Shoup, should tolerate sitting on a constant basis at this time if permitted to stand walk every 10 minutes to tolerance. So in other words, if he's going to sit, he can only sit for 10 minutes, and then he has to get up and stand and walk until he feels better. We don't know what Dr. Wolf was thinking about how long, but if you sit for 10 minutes and stand for 10 minutes, mathematically, he has to work a It's a ludicrous proposition that Hartford took that report and said, well, that's a reason to deny, because he can sit for 10 minutes at a time. Well, there's also, also, I had one of the clerks do a calculation. If we stick to the eight-hour day and six-hour sitting, those breaks are approximately three minutes each time. Is that enough? I don't think so. If you were to read Dr. Wolf's exit interview after he spent several hours being tested, he says, Mr. Shoup elected to rest on a treatment table upon completing the exam in the supine and side-lying position for 20 minutes. Mr. Shoup showed signs consistent with physical distress, including slow, guarded movements, grimacing, forward flexed posture, resting hands on knees, and frequent weight shifting. At this time, his pain after several hours of testing, one day of testing, not 40 hours in a week, one day, was 7 out of 10. And I'd remind the court, this testing was done while on fentanyl. Now, I mean... What medications, counsel, what medications is he taking to dull the pain here? There's mentioning, there's mentioned that he was taking opioids to mask the pain. Could you, um, could you tell me what the he was then raised up to morphine. That was back in 2006. They moved him to fentanyl. Fentanyl was the strongest drug he was put on. He was taken off because he was developing intolerance, but he was eventually put back on. At the time of the final termination, the IME performed by Dr. Wilcox found that he was taking OxyContin and fentanyl. And I think, you know, maybe karma is helping my client here. I know your first case dealt with fentanyl, and the court's aware that it's only prescribed for intractable, intolerable pain. This is not a minor pain reliever. This man was in horrendous pain. But he was taking, he was taking pain medication the whole time of one kind or another, and you say it was mainly a combination of fentanyl and morphine? At the time that he was last tested, which was in 2016, I can't say what he's taking today, of course, but yes, at that time, when he went through the FCE by Dr. Wolff, Hartford's FCE, he was on those narcotics. And Dr. Wolff said, you know, I think he could work, but I have to take into account that his pain could go up considerably if he didn't take the narcotics. And, you know, in your last case, Judge Wilkerson, you spoke about the real world. An employment assessment review was done by Hartford, and they said, first, they cherry-picked the report because they only said six hours of sitting and ignored the ten minutes at a time. But in the real world that we're talking about, we're talking about a man with a horrendously painful back disease who hasn't worked then for 11 years, who's taking narcotics, who can't use his hands, who has cognitive issues. Well, counsel, let me ask you about it, counsel. Yes, counsel. What are the effects, what does the record show as the effects of the narcotics on Mr. Shute, particularly as to his cognitive functions and his mental health? Well, as far as his cognitive function, there are, I could give you the record sites, but in 2007, there's several different reports talking about the effects on his mental effects. The side effects of the medication were severe. That's at A167 and A1342. Once again, in 2012, his doctor said that in 2015, his doctor again noted cognitive impairments in pain medication. This goes on. Well, how does that cognitive impairment, how do you define that for me? What is it, when you say he has a cognitive impairment, what does that prevent him from doing or cause? Your Honor, there's nothing in the record that specifically identifies how it impacts him, other than to say there are cognitive impairments. There was no neuropsychological testing done because there was no point to it. He also couldn't sit and he couldn't use his hands, so there was no testing done. I think we have to go on the common sense approach that somebody who's taking fentanyl and OxyContin is going to be able to do that. Continuing, I mean, during the 11-year period, I think we also should recognize that at the start of all this, Hartford was so sure he wouldn't go back to work that they offered him assistance in obtaining Social Security. That assistance, of course, was successful. I think we all know it was not altruistic on the part of Hartford to assist Mr. Shoup because it reduced its financial obligation to him from $3,500 a month to about $1,900 a month. This Court is well aware of the Supreme Court's view and this Court's view of insurers assisting an insurer in obtaining Social Security benefits and then terminating the benefits with no meaningful change in the condition. In fact, when Hartford decided it had paid Mr. Shoup long enough and terminated his claim, it didn't give him a viable reason for why it diverged with Social Security. Hartford advised Mr. Shoup that Social Security employs what it called a unique set of federal criteria and it falsely advised him that, unlike Hartford, the Social Security Administration does not conduct an analysis of skills that may be transferable to other occupations. That statement is blatantly false. As the Court knows, when an SSDI claimant reaches the ALJ level, vocational experts are present at hearings to perform a transferable skills analysis. As I've discussed at all times over the 11 years and continuing, he was always on 24-7 constant narcotics to alleviate the spinal condition. There was nothing else that could be done to relieve his pain. I think it's important to note that, as Hartford recognized, he was not going to work. At one point, it decided he wasn't going back to work and valued his claim according to its own notes at $255,000 and so it offered him $157,000 to buy him out. Now, it's interesting. If they value his claim at $255,000, why they only offer him $157,000? Perhaps that's the conduct of a financially self-motivated insurance company and not a fiduciary. With regard to what happened at the time of the termination, as you say, Hartford had three pieces of evidence. They had the Wolf FCE, which is, in my view, supportive of a finding of disability. They had a doesn't take in the real world and it also cherry-picks the report by failing to acknowledge that he could only sit for 10 minutes at a time and couldn't use his hands. Social Security has determined that for an unskilled sedentary position, a worker has to have use of his hands. All right, thank you very much, Mr. Cantor. We appreciate it. May it please the court, my name is Grace Murphy and I'm here today on behalf of Abilese and Defendants, Hartford Life and Accident Insurance Company, and the Hyatt Corporation Disability Plan. Judge Hilton's district court decision correctly assessed the record as a whole and the totality of the evidence and applied Fourth Circuit law correctly in both striking plaintiffs post-exhaustion submission and in affirming Hartford's claims decision. So with the four corners... So counsel, do we owe Judge Hilton's decision any deference? No, your honor, as I understand it, and I do do concur with plaintiffs counsel, that as I understand it, the standard of view is de novo, so you'll be looking at this with why you don't have an abuse of discretion provision in your plan because you would be due a whole lot more deference if the plan read, but why, I mean it would seem like such an obvious step to take to have an abuse of provision in your long-term disability plan, but I couldn't find any. Yes, your honor, the reason that the parties actually stipulated to de novo standard of review, if this policy was delivered in the state of Illinois, that's where Hyatt is headquartered and based, the plan is administered, and they have a state discretionary ban, so even if there is discretionary language, and I believe it may be, but even if there was the operation of that statute, we conceded resulting in an application... What statute are we talking about? It is an Illinois state statute, your honor, and it is in the joint appendix in our stipulation to... Well, I know, but a national insurance company can have a plan and take it, but I'm still perplexed as to why there's no abuse of discretion standard here, because we're not dealing with Illinois. Yes, your honor, I think that there is case law, the choice of law provisions the policy says will be, the policy will be construed under the state where the policy was delivered, which is Illinois in this case, and you know, I understand the standard of review is what it is, but we believe that the record here today still demonstrates that Harper made the correct decision. So let me ask you one other question about this. Normally, you know, when people have the combination of ailments that this gentleman had, over time, most people as they get older, I hate to say this, but most people, as they get older, tend to go downhill, or maybe not improve, but here you're trying to say, well, this person was on disability payment for over 11 years, and whoops, all of a sudden, and I don't get it. I don't get how somebody can be on a disability payment for 11 years, and suddenly be okay, unless there's some good explanation for it. But it just, I mean, obviously, age can present health problems that youth does not, and how does somebody just all of a sudden, after 11 years, multiple surgeries, pain issues, limited use of the hands, taking opioids, to mask the pain, sitting, standing restrictions, and all of a sudden, you say, oh, he's just fine, and I don't get it. Your Honor, if I may, a couple of responses to that. This man was in his 30s when he first went out on the plane. He had a surgery before wards were benefited. He then had surgeries in 2005 and 2006, and he had a spinal cord stimulator implanted in 2010. At that point, Your Honor, we're looking at six years later from that. There is evidence of a slow and steady strengthening and stabilizing. He was at a, and if you want to call it marginal improvement, if you want to call it a stabilizing, there was a status quo at the time that Hartford was, it is charged with continuing to look at claims. It cannot be, it is an ERISA fiduciary. It would be a breach of that duty to award a claim and never touch a file again for the maximum payable period. Well, counsel, let me ask you, other than the Wolf FCE and Dr. Lewis's report, what's your best evidence as to Mr. Hsu? Your Honor, I think if you look at the narrative and the totality of the record to understand why the Wolf FCE was even suggested in the first place, I think you'll understand better the sequence of events. What happened was Mr. Hsu had not seen an orthopedic. Afterwards, Humbacker and somebody else, Wood, Wolcock, there doesn't seem to be much ground there for Hartford to hang its hat on. Your Honor, in August 2015, Dr. Robinson, who was plaintiff's really only treating physician at that time of pain management, who was just monitoring, there was no change in treatment, he was just monitoring this ongoing treatment, submitted some restrictions and limitations in response to an attending physician's statement. Taken together, it suggested that the plaintiff may have sedentary full-time capacity. So in doing its due diligence, Hartford reached out to Dr. Robinson to say, we've submitted these, we're looking at it, would you agree that he has full-time sedentary capacity? Unbeknownst to Hartford, Dr. Robinson had actually left the practice and Dr. Wittenberg had stepped in to take over patient's care. She was the one who said, I cannot assess this without a functional capacity evaluation. So in good faith, Hartford then reached out and obtained the Wolf FCE as we've discussed. And the Wolf FCE, I think you need to look at as in its totality, plaintiff has pointed to some things, but it was a full, it was from about 1130 in the morning to five o'clock at night. It spent a lot of time. I realize what the Wolf FCE says, but then a few months later, you have the Humbacker examination, which doesn't do you all very much good. Yes, Your Honor. It just looks like the Wolf FCE and Dr. Lewis's report are somewhat outliers in the long history of disability. Your Honor, respectfully, I would disagree with that characterization. I think once the Wolf FCE came, they actually sent it back to Dr. Wittenberg, his pain management physician and said, please take a look at this and see if you agree. Please call us if you want to discuss. Here's some blanks to fill in. And she checked unequivocally. I agree with the conclusions. Plaintiff has full-time sedentary capacity. That is when Hartford then did his employability analysis and there were jobs that allowed him. And I think plaintiff's counsel has misread the FCE by saying he was actually required to stand up every 10 minutes. It suggested he was required to shift positions with tolerance. He was observed actually during the FCE sitting for 95 minutes with some positional changes, another 45 minute period. And so the jobs that we identified as representatives allowed for those positional changes. Well, let me ask you this, Ms. Murphy. These jobs like assignment clerk, jacket preparer, batch records clerk, can they be done by somebody who's on drugs such as fentanyl? Your Honor, on the question of his, any impairments from cognitive impairments, I don't, plaintiff's counsel testified that there was no need to do neuropsychological testing. I disagree with that. There is no real evidence of the extent of it. He was on his pain medication during the time of the FCE. And what Ms. Wolfe said is that if he wasn't, maybe his pain would be increased. But what she did not say was that the pain medication affected his ability to do those activities in any way. How could it not affect his ability? I don't understand that. Your Honor, it is plaintiff's burden to prove establishment. There's Dr., his own Dr. Robinson in 2014 indicated there were no cognitive impairments that plaintiff suffered. At times he said there were some cognitive impairments. But the question of whether his was cognitively impaired, plaintiff has never been able to demonstrate that that is true. And he has been able to engage in certain physical activities that he's been seen doing. He's lived on this pain medication for many years. He's reached a status quo. Well, if he'd gone on for all these years on the basis of disability because he can't sit, why would they need to also go into cognitive impairment at that time? I mean, if he was disabled purely on his physical inability to function, there's no legal requirement that he show alternatively a cognitive impairment, is there? Your Honor, I believe there is an obligation on him to demonstrate the full extent of his disability. The physical requirements, he was, as his own doctors in fall of 2015 into early 2016 were saying he had the physical sedentary capacity. He had 240 days to appeal the case. While he had a vocational assessment that mentioned medication impairments could, they were all very speculative. And there was no pinpoint evidence that he himself experienced side effects from medication that prevented him from working in a full time sedentary capacity in the occupations, sample occupations or otherwise that have been identified. You say that he is stabilized at a certain point over this period, but did Hartford actually believe that? Because you can continue to provide him disability benefits over a long, a long period of time, including a period of time in which you said, well, he had stabilized. But did you still regarded him as disabled? Your Honor, we deferred, we listened to his treating physicians. In 2013, there was an FCE that showed that he was not conditioned to return to work. It did not say he was, the main findings of that were that he was physically deconditioned. So at that point, we in good faith continued to pay benefits, allowing him additional time. And as he was observed and self-reported, his physical activities increased at that point. He was out repairing car stereos. He was driving. He was taking family members to medical appointments. He was out and about. And so when we continued to ask for, as it was our duty and requirement to ask his doctors for their medical opinion on his functionality, when those as of 2015 show that he at that point likely had sedentary capacity, Hartford went to the next step. Trying to get his attending physician to speak to whether that was. And that's what triggered the FCE in 2016 that demonstrated the full-time sedentary capacity. Your Honor, there's some policy provisions here that I think we need to look at that are to speak to the concerns of this Court. One is that the policy itself includes a continuing proof of disability clause, which provides that a claimant may be asked to submit proof that he continues to be disabled and he must provide it within 30 days or risk delay, suspension, or termination of benefits. Also, the proof of disability language in this policy includes an objective medical findings requirement that they must produce tests, procedures, or clinical examinations standardly accepted in the practice of medicine for his disabling condition. The last objective medical test was a 2015 CT scan. At that point, and again in this trajectory of this claim, he was not going to be undergoing any more orthopedic treatments. He was living his life as he had with chronic pain. But as the Gallagher case has shown, chronic pain in and of itself is not enough to establish a disability. You must find that the chronic, plaintiff must meet his burden of showing that chronic pain prevents him from performing all occupations in this case. In the Gallagher case, indeed, it said that whether Gallagher's pain made him totally disabled, however, hinges on whether it made him incapable of performing all the duties of his occupation. In that case, the insurer had showed that there was marginal improvement, that there was no objectively satisfactory proof that he was disabled. We suggest that the same applies here at this case. So counsel, no, go ahead, Judge Wilkerson. I just want to know how many spinal surgeries this individual had, back surgery is always a little tricky. How many surgeries on his spine did he have over this period? Before he filed the claim, he had one. And then as I understand it, he had two. But the last one was in 2006, 10 years before benefits were terminated. He had a spinal stimulator implant in 2010. I'm not sure that that counts as a true spinal fusion, but I did want to mention that too. So counsel, just assuming for purposes of argument, if we were to agree with plaintiff's counsel that the district court ruling was erroneous, what do you say would be the relief that should be granted? Your Honor, I think that the relief that would be granted is depending on how the opinion comes down. But I believe one of the options would be an award of past benefits and a remand to Hartford to continue looking at this claim. This claim was terminated again in 2016. There can be no award of future benefits after that time. And there needs to be a review of this claim. It depends if this court finds that there was some piece of evidence that was missing or that plaintiff submitted and we didn't review or something to that extent. It can also remand with no award of past due benefits and just ask that Hartford take another look. So, but I guess what I'm asking is if we were to find for the plaintiff here, do we simply vacate and return to the district court for further proceedings? Or do we vacate and return it to the district court with instructions? I have seen it done both ways, Your Honor. And I think you have the leeway to do either one in the unfortunate event that you come down that way. I'm just wondering what further proceedings would there be? It seems to me the record is you go one way or another on the record. And I'm just not sure what holds in the record there are or what further medical reports there would be or whatever. I don't know. I'm just not sure what needs to be done. We've got a record. We might just have to sort of make the call one way or the other. Your Honor, we haven't discussed the ruling on the motion to strike at this time. Assuming that that ruling stands and that plaintiff's post-exhaustion submission does not come in, then the record would be complete. If there is some inclination, and I would appreciate the opportunity to argue against that, but if that evidence from May 2017 does come in, then a remand would be more appropriate. All right. Is there anything further, Ms. Murphy? I guess your time is pretty close to expire. No, Your Honor. Thank you.  Mr. Cantor, you have some time for rebuttal. Thank you, Your Honor. Before I start, may I inquire of the court if they have any questions they'd like answered. Yeah, I have one. Yes, sir. As to that motion to strike, on this record, do you need that evidence in the record? No. Are you? Okay.  I think it was an error to exclude it from the record. Under Quisenberry, first, I have the utmost and highest respect for my opposing counsel. I think she's an incredible lawyer. I do have to disagree with her statement, though, about that May letter from Dr. Wittenberg, where she characterizes that Dr. Wittenberg agrees with the conclusion that he can return to work. There's nothing in the Wolf Report that says he can return to work. All she said was that she agrees with the findings, and the findings were he would only be able to sit for 10 minutes. So given the ambiguity of the Wolf Report and Dr. Wittenberg seeking to clarify what she was saying, that she thinks he's still fully disabled, I would think that any court looking at this de novo would want clarification of what she meant. But I don't need it to come in. Following that- So counsel, if we were to find in favor of Mr. Shoup, what do you say is the relief that should be granted? I think the first thing Ms. Murphy said, which was benefits paid to date and a reinstatement of the plan for Hartford to further administer. I agree. You can't order future benefits. We didn't ask for that. I think we should remember, before Mr. Shoup stopped working, he was earning close to $6,000 a month. When he goes out in disability, he drops to $3,500. When he's cut off by Hartford, all he has left is Social Security of about $1,100 a month. For the past five years, he's been living on $1,100 a month when he should have been getting $3,500. The axiom that justice delayed is justice denied is applicable here. This court, in my humble opinion, should find that he's entitled to benefits and direct the district court to order benefits reinstated. Is there anything further, Mr. Cantwell? Just a point that might interest you, Judge Wilkinson, that you asked about the abuse of discretion. I would point out that Mr. Shoup, at the time he was employed, was working in California. California has a ban on discretionary provisions. So if you're talking about the state in which the insured was employed, it was not Virginia, it was California. The case was filed in California and Hartford moved to transfer to Virginia because that's where he was residing at the time of the denial. So is it the California ban that's applicable? Well, no. It could be the California ban, but I think more appropriately, it is the Illinois ban. But if the Illinois ban applies to the state in which you're residing, he was residing in California. But the Illinois ban prohibits discretionary clauses to be included in group policies issued in the state of Illinois, which this policy was. All right. Thank you. Is that, do you have any further questions, Judge Agee? No, sir. No, I don't. Thank you, Your Honor. If there's no further questions, I want to thank you both. Can't come down and shake your hands, but we're very appreciative of the arguments that both of you have made. Hope you have a nice afternoon. Thank you, Your Honor. I'll ask the courtroom to adjourn court, Sani Dye. This honorable court stands adjourned until this afternoon. God save the United States and this honorable court.
judges: J. Harvie Wilkinson III, G. Steven Agee, Henry F. Floyd